Filed 8/3/23  Kasparian v. Edge Systems CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GREGORY J. KASPARIAN, | B318216 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 18STCV06077 |
| v. | |
| EDGE SYSTEMS LLC, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed.

Mann & Elias and Imad Y. Elias for Plaintiff and Appellant.

CDF Labor Law, Todd R. Wulffson, Ashley A. Halberda and Alessandra C. Whipple for Defendant and Respondent.

Gregory J. Kasparian sued his former employer Edge Systems LLC dba The Hydrafacial Company (Hydrafacial) under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for age discrimination and related causes of action, and causes of action based on Labor Code[1] violations and breach of contract stemming from Hydrafacial's alleged failure to pay him earned commissions. The trial court granted Hydrafacial's motion for summary adjudication in part. It entered judgment in Hydrafacial's favor on all Kasparian's claims after he stipulated to dismiss his remaining causes of action as nonviable in light of the trial court's ruling. We affirm the judgment.

**FACTS AND PROCEDURAL BACKGROUND**

"Because this case comes before us after the trial court granted a motion for summary [adjudication], we take the facts from the record that was before the trial court when it ruled on that motion." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) In accordance with our standard of review, we construe the evidence in the light most favorable to Kasparian, the party opposing summary adjudication, and resolve any doubts concerning the evidence in his favor. (*Ibid.*)

1.    *The parties*

Hydrafacial designs, manufactures, markets, and sells aesthetic technologies and products. Its corporate office is in Long Beach, California. Hydrafacial "maintains various regional sales areas" nationwide but has no physical locations outside

---

[1]    Undesignated statutory references are to the Labor Code unless otherwise stated.

California.  Dan Watson, the vice president of sales, was Kasparian's supervisor from March 2017 when Watson was hired until the end of Kasparian's employment.[2]  Clint Carnell is the CEO of Hydrafacial.

Kasparian lives in Georgia.  He moved there in February 2018 from Newton Square, Pennsylvania where he had lived since 2005.  After the move, he kept his Newton Square house as a second home where he stayed when visiting Pennsylvania.  His son lived in the house.  Throughout his employment, Kasparian's paystubs listed his Newton Square address.  In 2018, he paid Pennsylvania and Georgia state income tax.

Hydrafacial hired Kasparian—then age 51—in September 2012 while he was in California to interview with the company.  He was an exempt, commissioned, at-will employee.  Kasparian held the position of Corporate Account Director (CAD) and ran the east coast (east of the Mississippi) domestic sales team for the "Hydrafacial machine" until Hydrafacial terminated his employment in July 2018.  According to Watson, at the time, CADs were responsible for selling capital equipment, meaning Hydrafacial machines, and "closing the deal" for corporate accounts, such as large hotels or chains.

Kasparian was a top performer and continually produced sales.  In the last 18 months or so of his employment, he sold just under $1 million in "rolling sales."  He was told, " 'You keep producing like this, you're gonna be here a long time.' "  As a top achiever during the last two years of his employment, Kasparian

---

[2]      Watson was Hydrafacial's designated person most knowledgeable.

3

earned inclusion in "the coveted Presidents' Club," a revenue-based performance award.

## 2.  *Kasparian's work in California*

Kasparian "understood that working in California and traveling to the corporate offices in Southern California was an essential part of his job duties." Throughout his employment, he spent an average of 10 intermittent weeks each year working in California. He slept a total of eight to 12 weeks in California during 2015, 12 to 16 weeks during 2016—seven of which were in the fourth quarter, and 12 to 16 weeks during 2017. The longest consecutive-day visit Kasparian made to California during his employment was about two weeks.

When in California, Kasparian met with Hydrafacial department heads, employees, the company president, and his manager. He also met with clients and covered a "vacant California territory" another employee previously had handled.[3] In mid-2016, Kasparian had a dedicated office at Hydrafacial's Long Beach facility. He began staying at his former boss Dean Langdon's California apartment "for weeks at a time" after Langdon moved to Florida. Kasparian received personal mail in California at the Hydrafacial corporate office and at a coworker's residence.

In fall 2016, the person to whom Kasparian reported told him, " 'We really need to solidify the California business, and I need you to be here. I need you to be here like you live here.' " From 2016 to 2017, Kasparian considered moving to California because he was spending so much time there due to the turnover

---

[3]     By "vacant," Kasparian seems to mean "unassigned."

4

in employees.  His manager was "pushing hard" for him to do so.
Kasparian never owned property or paid state income taxes
in California.

### 3. *Hydrafacial's corporate realignment*

Two private equity companies took over Hydrafacial's
ownership in December 2016.  In mid-2017, Hydrafacial's
leadership decided to combine its medical (doctors' offices,
hospitals) and nonmedical (hotels, day spas, resorts) sales
functions and avenues so that sales representatives would be
selling to both types of customers.  Before, the sales force had
been split between medical and nonmedical sales.  CADs sold to
corporate, nonmedical accounts.  It was Watson's responsibility
to plan the realignment.

As a result of this corporate realignment, in July 2018
Hydrafacial "let go" of Kasparian, who was then 57 years old,
and about five other employees in corporate account sales—none
was under age 40.  At the time, there were about 75 to 80 people
on the sales team.  Kasparian was at the corporate headquarters
in California for what he believed was his standard quarterly
business review meeting.  Instead, Watson terminated his
employment.  Hydrafacial decided to terminate Kasparian's
employment around June 2018 and advised him of the
termination in July before announcing the realignment
to the company.  Watson did not give Kasparian a reason for
his termination nor did he tell him the company was realigning
its sales force to sell to both medical and nonmedical clients.
Kasparian recalled Watson telling him something along the lines
of, " 'Well, we're making some changes.  And I know there's never
a good time for this, but you'll bounce on your feet, you'll be fine.

This is always a tough situation, but you're fired' or 'you no longer have a job here.' "

Before the realignment, there were three CADs— Kasparian (age 57), Tracie Wertz (age 53), and Dan Townsley (age 39). Hydrafacial retained Wertz as a CAD after the layoffs, but in a different role.[4] Townsley's CAD position was eliminated along with Kasparian's, but Hydrafacial offered Townsley a capital sales manager (CSM) position—a position for which Kasparian was qualified—in the Philadelphia area about 40 miles from where Townsley lived. The CSM position was similar to the CAD position in that both CSMs and CADs sold Hydrafacial machines, but CSMs sold the machines to individual, rather than to corporate, accounts. Watson testified Hydrafacial didn't look for alternative positions for Kasparian because he was in Georgia and "there was nothing open[ ] in Georgia."

Hydrafacial asserted it let Kasparian go because there were no available open positions for him in Georgia, and Hydrafacial considered Wertz to have more experience and connections in the spa and wellness area—where Watson testified the CAD role had changed its focus—than Kasparian. Kasparian's revenue numbers were higher than Wertz's and Townsley's, however, and he had been at the company longer than both. (Wertz and

---

[4]     Watson testified that pre-realignment, a CAD was a "hunter . . . trying to get capital equipment sales." CADs received a base salary and commissions. After the realignment, the sole CAD (Wertz) had a "marketing type role" that involved meeting with corporate accounts, "try[ing] to open the door," and generate interest. Post-realignment the CAD received a base salary with a discretionary bonus.

Townsley were hired sometime in 2017 or early 2018.)  He was the only one of the three CADs who was terminated and not offered another position.

After the personnel changes were made, including Kasparian's termination, Hydrafacial announced the realignment to the sales team in a letter emailed from Watson.  The letter stated territories would be smaller and, as a result, Watson's sales team would be expanding.  The letter announced, "In the second half of 2018, we'll be adding 20 new positions in various account management roles . . . .  And we'll be adding even more in 2019."[5]  The letter also announced Wertz's role change:  "When it comes to selling capital into Corporate Accounts, Traci Wertz will continue to report to Dan Watson and will work closely with Erin and her team to identify and close opportunities both with new customers and with current customers looking to expand their businesses."

Shortly after his termination, Kasparian learned through an internet search that a regional sales manager position in North and/or South Carolina was open.  He did not ask anyone at Hydrafacial about it.  Nor did he tell anyone at Hydrafacial he could have taken the open CSM position in Pennsylvania. He filed an unemployment claim in Pennsylvania after his termination but did not finalize it.

4.   *Ageist comments*

According to Kasparian, after an informal department meeting at a bar in Long Beach—on an unspecified date—

---

[5]    Through 2020, Hydrafacial doubled the number of CSMs it hired.

Hydrafacial's CEO Clint Carnell said to a group of employees that included Kasparian, a few other men, and a group of women off to the side, " 'You're just a bunch of old guys.' "  During one of Carnell's "monologues" at an "OVR meeting," Carnell also said, " 'Just like a bunch of old guys, just like you, Kasparian.' "  Carnell described the company to the board and to the sales team as "a young and vibrant organization with attractive people" who "were hip and more happening."

Dean Langdon, Kasparian's former manager whom Hydrafacial terminated at the end of 2017, apparently told Kasparian a year or more before Kasparian's January 28, 2020 deposition, " 'They're getting rid of the old guys and bringing in a younger crew.' "[6]

## 5.    *Kasparian's lawsuit*

On November 26, 2018, Kasparian sued Hydrafacial in the Los Angeles County Superior Court.  His operative first amended complaint (FAC), filed May 10, 2019, alleged ten causes of action for:  age discrimination and failure to prevent discrimination under the FEHA, as well as wrongful termination in violation of public policy (first through third causes of action); California Labor Code violations for failure to pay all wages, failure to pay wages on termination, failure to provide an itemized wage statement, and failure to produce personnel and payroll records (fourth and seventh through ninth causes of action); breach of contract and breach of the implied covenant of good faith and

---

[6]     Kasparian testified he was aware Langdon was terminated for "not being the best team player."  He estimated Langdon made this statement "about a year" earlier, but he didn't "really remember" the exact timing.

8

fair dealing based on failure to pay commissions owed (fifth and sixth causes of action); and unfair competition based on failure to pay wages, allowing other employees to take commissions he earned, and terminating him to avoid paying owed commissions (tenth cause of action).

Kasparian alleged Hydrafacial "sought to re-invent itself" after its ownership change and focused on appealing to younger consumers. About two months after the change, Hydrafacial fired the company's then-president, one of the company's "older founders," and replaced him with a significantly younger individual. Allegedly, Hydrafacial deliberately began to hire younger employees "at the expense of older ones, in order to publicly appear young and dynamic."[7] Kasparian alleged Hydrafacial "targeted him for lay-off and refused to offer an alternative position because of his age."

Kasparian, who earned most of his wages through sales commissions and bonuses, alleged Hydrafacial changed his commission structure and sales target in 2018 to try to "force [him] out even earlier." Compared to his 2017 incentive plan, the 2018 plan doubled his sales target and "constituted a 68 [percent] reduction in variable compensation." He attached both plans to the FAC. Kasparian alleged on information and belief that Hydrafacial changed no other sales employee's commission plan, but admitted in his deposition the two other CADs, Wertz

---

[7] Kasparian claimed Hydrafacial engaged in a pattern of terminating older workers and named a few. Kasparian testified, however, he did not know the circumstances of those workers' terminations and thus had no facts on which to base his claim they were terminated due to their age.

9

and Townsley, got the same compensation plan that he signed in April 2018 when they started in early 2018. Hydrafacial allegedly paid Kasparian commissions under the less-favorable 2018 plan for sales he made before that plan was in place.

Kasparian also alleged Hydrafacial paid Langdon commissions Kasparian had earned from deals Langdon "stole" in 2016, continuing into 2017. After Kasparian complained, Hydrafacial took steps to prevent further theft, but Langdon's conduct continued, and Hydrafacial refused to determine what it owed Kasparian.[8]

Kasparian alleged Hydrafacial failed to pay him commissions he earned and was owed, and also terminated him to avoid having to pay him "significant sums" in owed commissions.

**6.    *Motion for summary judgment/summary adjudication***

On March 20, 2020, Hydrafacial filed a motion for summary judgment, or in the alternative, summary adjudication. Hydrafacial's supporting evidence included excerpts from Kasparian's deposition, Watson's declaration, Hydrafacial's

---

[8]    Kasparian testified Langdon took credit for business Kasparian had brought in. He estimated he would have earned $50,000 to $100,000 in commissions and bonuses had Langdon not stolen deals from him. The then-CFO reversed some of the deals, however, leaving what Kasparian guessed was about $15,000 to $25,000 in unpaid commissions lost to Langdon. He could not identify the client and the amount of commissions Langdon misappropriated that Hydrafacial owed him. He said Hydrafacial had not provided him with the information he needed to determine that.

10

at-will employment policy, Kasparian's July 27, 2018 wage statement, and the pleadings. Kasparian opposed the motion with supporting evidence, including his declaration and excerpts from his own deposition, excerpts from the depositions of Watson and Deborah Rodriguez, Hydrafacial's chief talent officer, formerly known as the chief human resources officer, Hydrafacial's responses and supplemental responses to requests for admissions and special interrogatories, and employment documents Kasparian signed.

The hearing on Hydrafacial's motion took place on October 1, 2021. The court issued a tentative ruling granting summary adjudication in Hydrafacial's favor on all but Kasparian's fourth and eighth causes of action, finding Kasparian conceivably could be entitled to overtime pay for work he did in the vacant California territory.[9] The court also overruled Hydrafacial's objections to Kasparian's declaration as well as Kasparian's objection to Hydrafacial's use of part of his deposition in support of two asserted undisputed material facts.[10] After hearing argument from counsel, the court took the matter under submission. On October 8, 2021, the court adopted its tentative ruling as its final order, granting Hydrafacial's motion for summary adjudication as to the first, second, third, fifth, sixth, seventh, and ninth causes of action.

---

[9] The court did not mention the tenth cause of action for unfair competition based on Hydrafacial's nonpayment of commissions. The FAC mislabeled that cause of action as the ninth cause of action.

[10] Neither party contends these evidentiary rulings were in error.

11

The parties entered a stipulated judgment in favor of Hydrafacial and against Kasparian "on all claims," that the court signed and filed on November 29, 2021. Kasparian agreed that, because he did not claim Hydrafacial failed to pay him overtime or misclassified him as an exempt, commissioned employee, the court's October 8 order effectively dismissed his fourth cause of action for unpaid wages. He also agreed that his eighth cause of action for waiting time penalties and tenth cause of action for unfair competition were derivative of his fourth cause of action and thus the court's order also effectively dismissed those causes of action. As Kasparian stipulated his fourth and eighth causes of action were based on only unpaid commissions, and the court entered judgment in favor of Hydrafacial on all claims, we refer to the court as having summarily adjudicated those causes of action.

## DISCUSSION

### 1. *Summary judgment and standard of review*

"Summary adjudication motions are 'procedurally identical' to summary judgment motions." (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 28 (*Zamora*).) A defendant moving for summary adjudication must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) The burden then shifts to the plaintiff "to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1180 (*Husman*); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.) A triable issue of material fact exists if "the evidence would allow a reasonable

12

trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar,* at p. 850.) The court is authorized to grant summary adjudication only if the motion "completely disposes of a cause of action." (Code Civ. Proc., § 437c, subd. (f)(1).)

We review an order granting summary adjudication de novo and independently decide whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) We consider "all the evidence set forth in the moving and opposition papers" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*)), and all evidence the parties submitted in connection with the motion, except that which the court properly excluded (*Merrill v. Navegar Inc.* (2001) 26 Cal.4th 465, 476).

"In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) "A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment." (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158 (*Featherstone*).)

Our de novo review does not absolve Kasparian of his burden to show error, however. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*) [judgment is presumed correct]; *Abdulkadhim v. Wu* (2020) 53 Cal.App.5th 298, 301.) " ' "As with an appeal from any judgment, it is the appellant's

responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.  In other words, review is limited to issues which have been adequately raised and briefed." ' " (*Abdulkadhim*, at p. 301; *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 867 ["an appellant must present argument and authorities on each point to which error is asserted or else the issue is waived"].)  Matters not properly raised or that lack adequate legal discussion will be deemed forfeited.  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.)

**2.**     ***Age discrimination under the FEHA***

As an initial matter, we reject Hydrafacial's contention, as did the trial court, that Kasparian is barred from bringing a FEHA claim because he wasn't a California resident and "no significant tortious conduct occurred within the state." There is no real dispute that Kasparian did not "reside" in California:  he never rented or owned a home in California or paid California state income tax.  Hydrafacial's contention that no tortious conduct occurred in California begs the question, however, as the evidence shows Hydrafacial is a California employer, Kasparian did some work in California, the decision to let him go was made in California, and the alleged ageist comments Kasparian argues show discriminatory animus were made in California.  (Cf. *Campbell v. Arco Marine, Inc.* (1996) 42 Cal.App.4th 1850, 1852, relied on by Hydrafacial [holding the FEHA did not apply to nonresident employee of California-based company where employee mostly worked outside of California and allegedly suffered injuries based on sexually harassing behavior that occurred outside the state].)  As triable issues

14

of material fact exist as to whether Kasparian can invoke the protections of the FEHA, we consider the merits of his contention that the trial court erred in granting summary adjudication on his FEHA and related causes of action.

   a.   *Applicable law*

The FEHA prohibits employers from discharging, or otherwise taking adverse employment actions against, an employee because of age. (Gov. Code, §§ 12926, subd. (b), 12940, subd. (a) [age refers to the chronological age of an "individual who has reached a 40th birthday"].) Ultimately, a plaintiff alleging age discrimination must prove that an adverse employment action was taken because of his or her age. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002 (*Hersant*).) " '[B]ecause of' means there must be a causal link between the employer's consideration of [the] protected characteristic," here, age, "and the [adverse] action taken by the employer." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215.) In a case involving mixed motives, that means the plaintiff must prove "discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor" in the adverse employment action. (*Id.* at pp. 215, 232.)

An employee can prove a FEHA violation by direct or circumstantial evidence. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 549 (*DeJung*).) "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." (*Id.* at p. 550.) " ' "Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the

15

same employment decision without reference to the unlawful factor." ' [Citation.]" (*Zamora*, *supra*, 71 Cal.App.5th at p. 34.)

When a plaintiff presents circumstantial evidence of discrimination, California courts apply the burden shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802, to analyze federal employment discrimination claims. (See *Guz, supra*, 24 Cal.4th at p. 354 [burden shifting test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially"].) Under that test, the employee has the initial burden at trial to establish a prima facie case of discrimination, which creates a presumption of discrimination. (*Id.* at pp. 354–355.) To establish a prima facie case of age discrimination under the FEHA, an employee must present evidence that the employee (1) is 40 years old or older, (2) suffered an adverse employment action, (3) was satisfactorily performing his or her job at the time of the adverse action, and (4) suffered the adverse action under circumstances giving rise to an inference of unlawful discrimination, such as having been replaced by "someone significantly younger." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 321; *Hersant, supra*, 57 Cal.App.4th at p. 1003 & fn. 3; see also *Guz*, at p. 366 [plaintiff may establish prima facie case of age discrimination in a reduction of force context by showing "persons significantly younger, but otherwise similarly situated, were ' " 'treated more favorably' " ' "].) The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. (*Guz*, at pp. 355–356.) If the employer meets its burden, the presumption disappears and the burden shifts back to the plaintiff to attack the

16

employer's reason as a pretext for discrimination or to offer other evidence of a discriminatory motive. (*Id.* at p. 356.)

That framework is modified in the context of an employer's motion for summary judgment or adjudication. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861 (*Serri*).) As the moving party, the employer " 'has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Ibid.*) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*." (*Guz, supra*, 24 Cal.4th at p. 358.)

If the employer meets this burden, "the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Serri, supra*, 226 Cal.App.4th at p. 861.) A FEHA claim also "is not properly resolved on summary judgment" when triable issues of material fact exist as to "whether discrimination was a substantial motivating reason for the employer's adverse employment action, even if the employer's professed legitimate reason has not been disputed." (*Husman,*

*supra*, 12 Cal.App.5th at p. 1186.)  The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be to create a reasonable inference of a discriminatory motive.  (*Guz, supra*, 24 Cal.4th at p. 362 & fn. 25.)

      b.     *Hydrafacial met its initial burden on summary adjudication*

It is undisputed that when Kasparian was terminated he was 57 years old, was a high performer, and was not offered an alternative position, while a significantly younger employee with Kasparian's same job was.  Hydrafacial met its initial burden on summary adjudication, however, by presenting evidence that it had a legitimate, nondiscriminatory reason for terminating Kasparian's employment, unrelated to his age:

- the company underwent a corporate restructuring to combine nonmedical sales and medical sales thereby eliminating the CAD role Kasparian held, which had focused on nonmedical corporate sales;
- Hydrafacial retained Wertz in the sole reconfigured CAD role—responsible for both medical and nonmedical corporate sales—because she had more experience and greater contacts than Kasparian in the spa and wellness area where that role now would focus;
- Hydrafacial did not offer Kasparian an alternative position because no comparable positions were open in the state of Kasparian's primary residence, Georgia; and
- Hydrafacial offered an open CSM position in Pennsylvania to Townsley when it eliminated his CAD position because he lived in the state.

This evidence was credible on its face and addressed why Hydrafacial released Kasparian but retained the two younger employees who had held his same position. (*Guz, supra*, 24 Cal.4th at pp. 357–358 [when issues involve whether employer "engaged in intentional discrimination" when deciding whom to retain and release, "employer's explanation must address them"].)  Thus, Hydrafacial's explanation sufficiently established it terminated Kasparian's employment for reasons "facially unrelated to prohibited bias." (*Id.* at p. 358, italics omitted.)

c. *Kasparian failed to present sufficient evidence to demonstrate his age substantially motivated his termination*

To survive summary adjudication, Kasparian had to present substantial evidence from which a jury reasonably could infer Hydrafacial's stated reasons were untrue or pretextual, or that it acted with a discriminatory animus so that a reasonable trier of fact could conclude Hydrafacial engaged in intentional age discrimination. (*Hersant, supra*, 57 Cal.App.4th at pp. 1004–1005.)

Kasparian initially argues he presented direct evidence of age discrimination through:  CEO Carnell's two " 'old guy[ ]' " comments; his description of the company as "young" and "vibrant" with "attractive," "hip," and "more happening" people; Langdon's opinion that Hydrafacial was " 'getting rid of the old guys and bringing in a younger crew,' " and the fact Hydrafacial released no one under age 40 during the realignment.  We agree with Hydrafacial this is not direct evidence of a discriminatory

19

animus.[11]  The CEO's remarks about "old guys" in a setting unrelated to hiring, retaining, or terminating employees; the description of an aesthetics company as young, vibrant, and attractive; and a comment that the company was bringing in a younger crew from someone terminated well before the realignment do not "prove[ ] the fact of discriminatory animus without inference or presumption." (*DeJung, supra*, 169 Cal.App.4th at p. 550.)  Rather, for comments reflecting a discriminatory animus to constitute direct evidence of such an animus, there must be "a causal relationship between the comments and the adverse job action." (*Ibid*.; see also *Zamora, supra*, 71 Cal.App.5th at pp. 36–37 [describing federal case involving direct evidence of age discrimination where evidence showed members of a board of directors said they wanted to hire someone age 45 to 50 years old for the job and "were not considering the plaintiff because they wanted a younger man"].)

Nor can we conclude the fact that the six employees Hydrafacial terminated were all over age 40 directly proves animus—or raises a reasonable inference that Kasparian's age was a substantial motivating factor for his termination. Hydrafacial retained a 53-year-old—only four years younger than Kasparian—who had held the same position, and the individual who terminated Kasparian's employment was about Kasparian's age.

Kasparian cites several cases where discriminatory or pretextual comments precluded summary judgment of a

---

[11]    Indeed, Kasparian described this very same evidence in his opposition to Hydrafacial's motion as circumstantial evidence.

20

plaintiff's FEHA claim.  In those cases, however, the plaintiff presented evidence the comments were made in connection with the adverse employment action raising a rational inference of a causal link between the discriminatory animus and the adverse action.  (See, e.g., *DeJung, supra*, 169 Cal.App.4th at pp. 550–551 [comments from individual on hiring committee to plaintiff that " 'they want somebody younger, maybe in their 40's,' " and to someone else that plaintiff was " 'a great guy but we're looking for someone younger,' " were evidence of discriminatory animus and raised an inference that the employment decision itself was discriminatory]; *Price v. Victor Valley Union High School District* (2022) 85 Cal.App.5th 231, 244–245 [jury could infer employer's proffered reason for rescinding job offer—a failed physical exam—was pretextual and the true reason was plaintiff's actual or perceived disability where individual who rescinded the offer repeatedly told plaintiff she was " 'a liability' "]; *Doe v. SoftwareONE Inc.* (2022) 85 Cal.App.5th 98, 100–101 [female over 40—who was fired for "poor performance and redundancy"—presented evidence that " 'taken as a whole, *could* support a reasoned inference of discriminatory or retaliatory animus,' " including that she was replaced by younger males, she had been performing well, and a director's statements to her that the company was a " 'guy's club,' " so she was " 'never going to make it,' " and  she was a " 'bitch' "]; *Galvan v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 549, 561–563 [evidence supervisor "consistently demeaned" plaintiff and other employees about their accents and English-speaking abilities, and that plaintiff had learned the supervisor planned to fire her and other foreign-born employees, was sufficient to demonstrate discriminatory motive and causal nexus between supervisor's

21

animus toward plaintiff's national origin and plaintiff's constructive discharge].)

In contrast, Kasparian presented no evidence that Carnell's ageist comments were made in the context of any employment decision or to suggest Kasparian's job was in jeopardy due to his age, unlike the comments with respect to sex/gender and national origin made in *SoftwareONE* and *Galvan*. Indeed, Kasparian presented no evidence as to the timing between Carnell's comments and the decision to terminate his employment at all to suggest a causal relationship existed between discriminatory animus and Kasparian's termination. Nor did Kasparian ever report Carnell's comments to anyone at Hydrafacial during his employment.

And unlike in *DeJung* and *Price*, although Carnell was Hydrafacial's CEO, Rodriguez testified Carnell had no input in the decision to terminate Kasparian. Kasparian presented no evidence to suggest otherwise and admitted he was unaware of any facts demonstrating Carnell had any input in the decision to terminate his employment.[12] Moreover, Watson—who planned the realignment and personnel changes—testified he never spoke to Carnell about Kasparian and never heard Carnell or anyone else at Hydrafacial make ageist comments.

Nevertheless, Kasparian asserts a jury could infer age substantially motivated Hydrafacial's termination of his employment from the above evidence considered with the following additional circumstantial evidence: Kasparian was a

---

[12]   Carnell, whom Kasparian estimated was 48 years old, himself was within the protected group of individuals over 40.

22

top performer; Kasparian was the oldest, had the most seniority, and highest revenues of the three CADs and was the only one of them not retained or offered another position; Hydrafacial did not give him a reason for his termination; he had a home in Newton Square close to the open CSM position in Philadelphia, for which he was qualified, but was not offered the position; Townsley, who was offered the open Philadelphia position, was 39 years old, and his home was further from Philadelphia than Kasparian's Newtown Square house; the realignment announcement did not mention Wertz's spa and wellness experience; Kasparian had spa and wellness and medical sales experience, but no one asked him about that experience before terminating him; and Hydrafacial expanded.

Considering the evidence in its totality, and in the light most favorable to Kasparian, we conclude it is insufficient to permit a rational trier of fact to infer Hydrafacial was substantially motivated to terminate Kasparian's employment because of his age. Kasparian first contends the trier of fact reasonably could infer age was the motivating factor in not offering the open Philadelphia CSM position to him over then-39-year-old Townsley given Kasparian had a better performance record and seniority, and Hydrafacial's knowledge that Kasparian owned a home near Philadelphia. In other words, Kasparian contends the jury could find the lack of an open position in Georgia, in light of the CEO's comments, was a pretext for discriminatory animus.

We disagree. As we said, there is no evidence the CEO was involved in personnel decisions surrounding the realignment, and Watson—who made the decisions—himself was 56 or 57 years old at the time. A trier of fact thus could not reasonably infer

23

Hydrafacial was using the location of the open CSM position as an excuse to terminate Kasparian's employment because he was older. Both Watson and Rodriguez testified they "tried to find spots" for everyone if they had them. They did not offer to reassign Kasparian because there were no open positions in Georgia where he lived.[13] And, although Kasparian had traveled a great deal as a CAD, one of the announced objectives of the realignment was to create smaller territories. Rodriguez testified the location of the CSM position was important because "[o]therwise it costs a lot of money in travel" as CSMs had to visit customers directly to demonstrate the system. The CSM position also sold machines to individual, professional accounts, rather than the multilocation, corporate accounts to which Kasparian had sold.

Nor can we conclude Hydrafacial's decision not to offer the Philadelphia position to Kasparian, despite knowing he had a home there, raises a rational inference of animus. It is undisputed Kasparian had moved to Georgia months before the realignment and considered his Pennsylvania house a second home, while Townsley primarily resided in Pennsylvania. Nor does Kasparian contend Hydrafacial made a younger employee an unsolicited offer to take an out-of-state position. Moreover, Kasparian never asked to be reassigned, even after learning of an open position in one or both of the Carolinas shortly after his termination.

---

[13]    They also testified *all* personnel changes due to the realignment were made *before* sending the announcement letter.

24

Second, Kasparian contends Hydrafacial's stated reason for retaining Wertz over him "doesn't withstand scrutiny," and thus supports an inference, along with Carnell's ageist comments, that "[a]ge was the unlawful motive for Wertz'[s] selection over [him]." He argues no nondiscriminatory reason "explains why [Hydrafacial] preferred the younger, lesser performing, newly hired, Wertz, over the older, better performing, experienced [Kasparian]."

We cannot agree. Hydrafacial presented uncontroverted evidence that it chose Wertz to remain in the sole, reconfigured CAD role because she had more contacts in the spa and wellness world and more experience in that area than Kasparian. Watson acknowledged Kasparian would have had some experience in that area,[14] but Wertz was a member of a worldwide organization called "Global Wellness." She thus knew "a lot of people" in the spa and wellness area, "more so than [Kasparian] did."

Kasparian argues a jury could infer this reason was false based on the fact Hydrafacial did not mention Wertz's spa experience in its corporate reconfiguration announcement. That letter generally announced what the new sales team would look like; it was not an explanation as to why certain individuals were selected for certain roles. We thus do not see how a jury reasonably could find the omission of Wertz's spa experience from the announcement raises a triable issue of fact as to whether Hydrafacial impermissibly chose to retain Wertz—

---

[14] Kasparian testified he had spa and wellness experience, as well as experience in 2012 and 2013 selling Hydrafacial machines to individual doctors' offices.

25

a 53-year-old—over Kasparian because she was four years younger than he was.

Kasparian makes much of his higher revenue generation compared to Wertz (and Townsley), but Hydrafacial never asserted it terminated Kasparian for poor performance. Watson testified sales performance was not a factor specifically related to whom to retain in the CAD position. Rather, they "tried to look at it, more realistically, who will be [a] best fit for the gap that we had going forward."

Wertz may have absorbed Kasparian's old territory in her new CAD role, but no reasonable factfinder could infer age motivated Hydrafacial to retain Wertz over Kasparian. (*Guz, supra*, 24 Cal.4th at p. 358 [prerogative to consolidate positions does not mean employer "may 'use the occasion as a convenient opportunity to get rid of its [older] workers' "].) First, Wertz —at age 53—was a member of the protected class. Second, at only four years Kasparian's junior, we cannot say she was "significantly" younger than Kasparian to raise a triable issue of material fact that she was treated better than he was due to her younger age. (*Id.* at p. 366.)[15]

---

[15] In an apparent attempt to discount the fact Wertz herself was within the age group protected under the FEHA, Kasparian relies on *Mahler v. Judicial Council of California* (2021) 67 Cal.App.5th 82, 92–93, 126, where the court held a disparate impact claim under the FEHA can be based on the disparate impact of an employment decision on an older subgroup within a group of employees aged 40 and older. We agree with Hydrafacial that Wertz, who also was in her 50s and only four years younger than Kasparian, "can hardly be considered to be part of a different 'subgroup within the

In sum, Hydrafacial's decision to retain Wertz and Townsley over Kasparian, despite his seniority and higher revenue production, may not have seemed fair to some, but we cannot conclude a trier of fact reasonably could conclude its stated reasons for doing so "were pretextual and used merely to veil an act of age discrimination." (*Hersant, supra*, 57 Cal.App.4th at pp. 1005, 1009 [triable issue of whether employer's actions were "reasonable and well considered" did not preclude summary judgment on age discrimination action].) As the evidence does not raise a triable issue of fact from which a reasonable juror could infer Hydrafacial's decision was substantially motivated by Kasparian's age, the court did not err in granting summary adjudication on his first cause of action for age discrimination and his derivative second and third causes of action for wrongful termination in violation of public policy and failure to prevent discrimination, respectively. (See *Featherstone, supra*, 10 Cal.App.5th at p. 1169 ["if an employer did not violate FEHA, the employee's claim for wrongful termination in violation of public policy necessarily fails"]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284, 289 [finding of underlying discrimination or harassment under Gov. Code,

protected 40-years-of-age-and-older class' than [Kasparian]." (See *Guz, supra*, 24 Cal.4th at pp. 366–367, 369 [implying age gap of less than 10 years not significant]; *K.H. v. Secretary of Dept. of Homeland Security* (N.D.Cal. 2017) 263 F.Supp.2d 788, 796 [three-year age difference "insufficiently substantial"].)

27

§ 12940 necessary to support finding employer failed to prevent discrimination or harassment].)[16]

### 3. *Kasparian's Labor Code and contract causes of action*

Kasparian's causes of action arising under California's Labor Code include: the fourth cause of action for failure to pay wages, seventh cause of action for violation of section 226, eighth cause of action for failure to pay all wages upon termination under section 203, and ninth cause of action for failure to provide payroll records in violation of sections 226 and 1198.5, although Kasparian asserts that cause of action is "principally based on . . . section 226." In his opening brief, Kasparian also concedes his fifth cause of action for breach of contract "stem[s] from the California Labor Code."[17] He thus addresses these causes of action on appeal together.

---

[16] The FAC alleged Hydrafacial also terminated Kasparian's employment in violation of public policy on the ground it did so to avoid having to pay him "his owed wages that were due and/or about to come due by virtue of his commission plan." Kasparian asserted no argument on appeal in support of that alternative basis for his second cause of action. He has forfeited it. He argued his wrongful termination claim would not necessarily fail if we were to find FEHA inapplicable, as Hydrafacial argued, because his claim also could be based on the federal statute prohibiting age discrimination, 29 U.S.C. § 623. For the same reasons Kasparian's FEHA age discrimination claim fails, so would his claim based on wrongful termination in violation of the federal policy against age discrimination.

[17] Kasparian makes no argument on appeal at all as to why the court erred in granting summary adjudication on his sixth

Kasparian based these five causes of action on Hydrafacial's alleged failure to pay him earned commissions. Commissions are defined as "wages" under the Labor Code. (§ 200, subd. (a) [defining "wages" to include commission payments]; *Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 584 [" 'It is undisputed that commissions are "wages[.]" ' "].) He does not contend Hydrafacial failed to pay him—or inaccurately reported—his base salary.

    a.    *Applicable law*

As it does on appeal, Hydrafacial relied on *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557 to argue Kasparian lacked standing to enforce the Labor Code because he never resided, received pay, or worked exclusively or principally in California. (*Id.* at p. 578 ["If an employee resides in California, receives pay in California, and works exclusively, or principally, in California, then that employee is a 'wage earner of California' and presumptively enjoys the protection of [Industrial Welfare Commission] regulations."].)

Hydrafacial presented evidence demonstrating Kasparian was not a California wage earner under *Tidewater*. Throughout his employment: Kasparian permanently resided in Pennsylvania and then Georgia, not California; he worked on average only about 10 weeks per year in California, and

---

cause of action for breach of the implied covenant of good faith and fair dealing or why his tenth cause of action for unlawful business practices should be reinstated. He thus has forfeited his appeal as to those causes of action. (*Foxen v. Carpenter* (2016) 6 Cal.App.5th 284, 295 [failure to raise a claim of error in the opening brief forfeits the argument].)

12 to 16 weeks per year in the two years preceding his termination; he received his pay in Pennsylvania; and he paid no California state income tax.

Kasparian, however, contended, as he also does on appeal, the appropriate standard to apply to his commission-based claims is that articulated in *Ward v. United Airlines, Inc.* (2020) 9 Cal.5th 732 (*Ward),* and its companion case, *Oman v. Delta Air* (2020) 9 Cal.5th 762 (*Oman*). Both of those cases answered questions certified by the Ninth Circuit about whether airline workers—who performed most of their work outside California— could enforce California's wage statement requirements under section 226 (*Ward* and *Oman*), and California's requirement that employees be paid twice-monthly under section 204 (*Oman*).[18] The trial court granted summary adjudication on Kasparian's Labor Code claims, finding Kasparian failed to present sufficient evidence to demonstrate his having worked three months

---

[18] Kasparian also argues, as he did below, the standard discussed in *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1201, 1206 (*Sullivan*) applies here. There, our high court held California's overtime laws applied to nonresident employees who performed full days and weeks of work in California. *Sullivan* expressly limited its rationale and holding to California's overtime laws, cautioning "one cannot necessarily assume the same result would obtain for any other aspect of wage law." (*Id.* at p. 1201; see also *Ward, supra*, 9 Cal.5th at p. 751 [noting court did not hold in *Sullivan* that "the employment laws of another state can *never* apply to work performed in California" nor that "California's employment laws *always* apply to every minute or hour of work performed in this state"].) As Kasparian cannot claim entitlement to overtime pay, we find *Sullivan* inapplicable.

out of the year in California met the " 'significant relationship' standard" set forth in *Ward*.[19]  (*Ward*, at p. 755.)

Hydrafacial contends Kasparian mistakenly rejected *Tidewater* for *Ward* and *Oman* (and *Sullivan*).  But, as two of Kasparian's causes of action are based on section 226, *Ward* is applicable.  The plaintiffs there were flight attendants and pilots for a global airline based outside California, who resided in California but performed most of their work in airspace outside California's jurisdiction.  (*Ward, supra*, 9 Cal.5th at p. 740.) In determining whether the plaintiffs could enforce California's wage statement requirements under section 226, the court concluded "the Legislature intended for section 226 to apply to workers whose work is not performed predominantly in any one state, provided that California is the state that has the most significant relationship to the work."  (*Ward*, at p. 755.)

The court explained, "[T]o determine whether section 226 applies, courts should consider in the first instance whether the employee works the majority of the time in California, or in another state.  For employees . . . who do not work principally in any one state, a court should consider secondarily whether the employee has a definite base of operations in California, in addition to performing at least some work in the state for the employer."  (*Ward, supra*, 9 Cal.5th at p. 760.)  Applying that reasoning to the plaintiffs before it, the court continued, "Thus,

---

[19]    The court granted summary adjudication on Kasparian's two contract causes of action, however, on the ground Kasparian "fail[ed] to cite to any legal authority for the proposition that the failure to pay commissions has a standard separate from the one established in *Tidewater*."

31

if a pilot or flight attendant has a designated home-base airport, section 226 would apply if that airport is in California, and not if it is elsewhere." (*Ibid.*) The court expressly found "employer location, employee residence, receipt of pay, and payment of taxes"—factors listed in the Ninth Circuit's question—were "not pertinent." (*Ibid.*) The court then answered the Ninth Circuit's question as follows: "Section 226 applies to wage statements provided by an employer if the employee's principal place of work is in California. This test is satisfied if the employee works a majority of the time in California or, for interstate transportation workers whose work is not primarily performed in any single state, if the worker has his or her base of work operations in California." (*Id.* at pp. 760–761.)

In *Oman*, applying the test articulated in *Ward*, the court concluded section 226 did not apply "to work performed in California during pay periods in which the employee, based outside California, works primarily outside California." (*Oman, supra*, 9 Cal.5th at p. 776 ["A non-California-based employee who works in California 'only episodically and for less than a day at time' [citation] is not entitled to a wage statement prepared according to the requirements of California law."].) The court also held that section 204, which dictates the timing of payment of wages and works together with section 226, "is subject to the same limits as section 226 and applies only to pay periods during which an employee predominately works inside California." (*Oman*, at pp. 776, 778.)

b.    *Analysis*

Considering the evidence in the light most favorable to Kasparian, and applying the test in *Ward*, the record demonstrates Kasparian did not principally work in California.

During the course of his employment, Kasparian spent on average 10 non-consecutive weeks per year working in California, and between 12 and 16 non-consecutive weeks per year in 2016 and in 2017. The longest consecutive visit he made to California for work was about two weeks. A finder of fact also reasonably could conclude Kasparian did not spend a majority of his time working in any other state. Kasparian declared he was in Pennsylvania, where he had his "permanent residence," for "significantly less than 50 [percent] of [his] working time"; when he "wasn't at the office in California, [he] was on the road in Texas, Florida, New York, Maryland, and many other states"; and he "spent the most time on the road and much time at the California office."

Under *Ward*, the question thus is whether "California's relationship to the work is more significant than any other state's." (*Ward, supra*, 9 Cal.5th at p. 759.) Kasparian contends it was, declaring that by mid-2016—when he had a dedicated office[20] at Hydrafacial's headquarters to use—and "in the future," California was his "home base of operations." Kasparian presented evidence that, during his stays in California, he attended meetings at Hydrafacial's headquarters and, at some point, "covered a vacant California territory" and met with clients there. Of the weeks he spent in California in 2016, seven were during the fourth quarter—presumably because he was working in the vacant territory. Kasparian received personal mail at Hydrafacial's headquarters and a colleague's residence, and

---

[20]　He stated he then used an "open office" when the company moved to a new building.

stayed at a colleague's residence. And, from 2016 to 2017, he considered moving to California because he was traveling there so often.

We agree with the trial court that the evidence Kasparian presented does not demonstrate the work he performed for Hydrafacial had a more significant relationship to California than any other state. Akin to a flight attendant's assigned "home" airport—from where he or she begins or ends each flight —Kasparian was assigned to head up sales for the *east coast* territory.[21] As Hydrafacial has no physical locations outside California, Kasparian's "base of operations" so to speak would have been his home. (See *Ward, supra*, 9 Cal.5th at p. 760 [explaining that if a pilot or flight attendant had "a designated home-base airport, section 226 would apply if that airport is in California, and not if it is elsewhere"]; *Gunther v. Alaska Airlines* (2021) 72 Cal.App.5th 334, 341 & fn. 2, 343 (*Gunther*) [nonresident flight attendants, who did not perform a majority of work in one state, were "based" in California because they were assigned to California, where they began and ended each trip].)

There certainly is no evidence Kasparian "present[ed] himself . . . to begin work" in California before traveling to a state in his assigned east coast, or other brand-related, territory. (*Ward, supra*, 9 Cal.5th at p. 755.) In contrast to the flight attendants who were based in California and traveled elsewhere, Kasparian essentially was based in Pennsylvania and—after

---

[21] Beginning in early 2018, CADs theoretically could travel to anywhere in the country because the territories were set up by brand. In other words, if a corporate brand had multiple locations, the CAD would travel to those locations.

he moved—in Georgia.  It was from his home that he traveled to and from different states for work, including California.  True, Kasparian spent about 20 to 30 percent of his time in California during his last years of employment.  In light of Kasparian's job duties—to run the east coast sales team and sell Hydrafacial machines to multi-location corporate accounts—we cannot conclude his required travel to the Hydrafacial offices in California rendered California the state with the most significant relationship to the work he performed.

Arguably, while covering the vacant California territory, Kasparian reported for work in California.  Kasparian argues that, at a minimum, his seventh and ninth causes of action based on section 226 "are viable" for the portion of time he worked in California, which comprised full days.  Nothing in the record indicates he was reassigned from the east coast (or other brand) territory to the California territory, however, to raise an inference that the additional California work constituted a change in his base of operations.  (See *Oman, supra*, 9 Cal.5th at p. 775 [shifts in flight attendant's employment such as taking on a new job as a "gate agent" at a California airport or being "assigned to a different home airport," thereby changing the employee's "base of operations," would affect whether section 226 applied]; *Oman v. Delta Air Lines, Inc.* (N.D.Cal. 2022) 610 F.Supp.3d 1257, 1268, on remand from Ninth Circuit [above examples support theory "*Ward* was intended to capture significant changes in employment—such as being assigned a different home base airport, or taking on a new position— and not based on the number of trans state flights scheduled per each pay period"].)

From fall 2016 and into 2017, Kasparian was told to come to California as if he lived there, and he considered moving. But given the limited 12 to 16 weeks per year he spent in California during that period, a trier of fact could conclude only that Kasparian continued to work primarily in his own assigned territory or territories and thus had not relocated his base of operations to California. (*Oman, supra*, 9 Cal.5th at p. 776 [concluding "section 226 does not apply to work performed in California during pay periods in which the employee, based outside California, works primarily outside California" in answering Ninth Circuit's question about flight attendants who worked " 'only episodically and for less than a day at a time' " in California].)

Moreover, whether Kasparian primarily worked in California, or was based in California, *during* a given pay period is relevant to whether section 226 applies. (*Gunther, supra*, 72 Cal.App.5th at p. 346, citing *Ward, supra*, 9 Cal.5th at p. 753 ["The increment of work covered by section 226—the pay period—is relevant to this inquiry in the sense that the statute 'does not operate at an hourly, daily, or even weekly level.' "].) Kasparian declared he worked in California during the entirety of a pay period but did not state what that pay period was.

In any event, Kasparian contests only the accuracy of his commission payments, not his base salary. According to the CAD Incentive Plan Kasparian signed in April 2018—attached to his FAC—commissions were paid monthly for completed equipment sales and quarterly for other types of commissions. He would have earned commissions for work performed in California based on Hydrafacial machines (and possibly consumables) he sold there while he covered the vacant

36

California territory. Yet, Kasparian presented no evidence demonstrating he was "based" in California for an entire monthly or quarterly commission pay period. Hydrafacial admitted Kasparian worked in California for a total of seven intermittent weeks during the fourth quarter of 2016, but Kasparian cited no evidence in the record showing he worked the vacant California territory throughout a monthly commission pay period.

And, as one appellate court put it, *Ward* does not require a "pay-period-by-pay-period analysis." (Cf. *Gunther, supra*, 72 Cal.App.5th at pp. 344, 346–347 [even if flight attendants based in California spent more time during a particular pay period in another state, because they were based in California and did not perform a majority of their work in any one state, section 226 still applied].) Thus, even if Kasparian worked more in the vacant California territory than in his assigned territory for one or two pay periods, because he remained based out of the east coast, section 226 would not apply.

Nor does Kasparian articulate what commissions he earned from his work *in California* that were not paid or accurately reflected in his wage statement. The FAC alleged Kasparian was "the procuring cause" of sale to an account in *New York* for which he was entitled to commissions, as well as for "tens of additional clients/contacts," but did not allege those sales were to California contacts. Similarly, Kasparian alleged "Langdon stole deals and commissions" from him but only generally stated those deals were in "Kasparian's territory." Nor does Kasparian cite to evidence demonstrating, for example, that he sold Hydrafacial machines, or caused the sale of a Hydrafacial machine, to a client in the vacant California territory.

Accordingly, we conclude the trial court properly granted summary adjudication on Kasparian's seventh and ninth causes of action based on section 226 because his work was not based out of California, and even if it temporarily were, Kasparian cited no evidence demonstrating he earned commissions from work in California during a complete pay period there.

As "the application of California wage and hour protections to multistate workers . . . may vary on a statute-by-statute basis," we separately consider Kasparian's other claims based on the Labor Code.  (*Oman, supra*, 9 Cal.5th at p. 772; see also *Ward, supra*, 9 Cal.5th at p. 751 and *Sullivan, supra,* 51 Cal.4th at p. 1201.)

Asserting that his "[f]ourth [c]ause of [a]ction for failure to pay wages, and the [f]ifth [c]ause of [a]ction for breach of contract for which it is based on . . . stem from unpaid commissions, which are wages," Kasparian apparently argues those causes of action are not subject to summary adjudication under *Sullivan*.  He appears to argue that, like California's " 'strong interest in governing overtime compensation for work performed in California,' " California would have a strong interest in a claim for unpaid wages given its worth here, "alleged to be in excess of $700,000."  He notes he spent up to 16 weeks a year in California, which is more than the days the plaintiffs in *Sullivan* spent in the state.

As we noted, *Sullivan* concerned the application of California's overtime laws to nonresidents who worked overtime in California, not to the failure to pay commissions earned by an exempt employee whose primary job was to sell his employer's product in other states.  (*Sullivan, supra*, 51 Cal.4th at pp. 1201, 1206.)  We do not find *Sullivan* analogous.  While statute and

38

wage orders govern entitlement to overtime pay, "The right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." (*Koehl v. Verio, Inc.* (2006) 142 Cal.App.4th 1313, 1330.) The 2017 and 2018 commission plans attached to the FAC do not state they are governed by California law.[22]

To the extent *Ward* applies to Kasparian's claims for nonpayment of wages, which are limited to earned commissions, his claims fail for the same reasons already discussed. As Kasparian asserts no other argument as to why the court erred in granting summary adjudication on these two causes of action, he has failed to meet his burden on appeal affirmatively to show error. (*Denham, supra*, 2 Cal.3d at p. 564.)

Kasparian's eighth cause of action for waiting time penalties based on Hydrafacial's alleged failure to pay all commissions it owed him at his termination is derivative of his cause of action for failure to pay wages. Kasparian argues—without citation to legal authority—that, because Hydrafacial terminated his employment while he was in California, his eighth cause of action for failure to pay all wages upon termination survives. We reject this contention. (See *Ward, supra*, 9 Cal.5th at pp. 759–760 [rejecting plaintiff's proposed test to look "to the

---

[22] Kasparian declared he signed several employment documents "governed" by the Labor Code. The documents Kasparian submitted with his declaration included a proprietary information and invention assignment agreement, a statement declining Hydrafacial's California health plan, and a confidentiality agreement. The agreements state they are covered by California law.

location where the conduct supporting liability occurred" as unworkable in the context of claims of noncompliant wage statements and inadequate wage payments, as the offending conduct could be said to have occurred where the payment is issued, where it is received, or even wherever the employee has a bank account for direct deposit purposes].) Kasparian makes no other argument affirmatively to show the court erred in granting summary adjudication on his eighth cause of action.

Below, however, Kasparian urged the trial court to apply the *Ward* test, noting *Oman* concluded that test applies to section 204, another statute governing the timing of the payment of wages. (*Oman, supra*, 9 Cal.5th at pp. 776, 778.) Assuming, without deciding, the test articulated in *Ward* would apply to Kasparian's eighth cause of action based on section 203, his claim would fail for the same reasons his claims based on section 226 fail.

Accordingly, we conclude the trial court properly granted summary adjudication of Kasparian's remaining Labor Code and contract causes of action.

**DISPOSITION**

The judgment in favor of respondent Edge Systems LLC dba The Hydrafacial Company is affirmed.  The parties are to bear their own costs on appeal.[23]

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.

---

[23]    See *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 950–951 (holding appellate courts may not award costs on appeal to a prevailing FEHA defendant "without first determining that the plaintiff's action was frivolous, unreasonable, or groundless when brought, or that the plaintiff continued to litigate after it clearly became so").